**Patricia Lynn Gaily FOREST, Plaintiff,**

v.

**E.I. DuPONT de NEMOURS, AND COMPANY, et al., Defendants.**

No. CV–N–90–467–ECR (PHA).

United States District Court,
D. Nevada.

April 15, 1992.

Blaine E. Cartlidge, Gordon & Silver, Ltd. by Don Springmeyer and Jeffrey A. Dickerson, Reno, Nev., for plaintiff.

Kathryn C. Grogman, Dickson, Carlson & Campillo, Santa Monica, Cal., and Dan C. Bowen, Lionel Sawyer & Collins, Reno, Nev., for defendants.

## ORDER

EDWARD C. REED, Jr., Chief Judge.

Defendant E.I. DuPont de Nemours ("DuPont") filed its motion for full summary judgment on December 10, 1991 (document # 28).[1] Plaintiff's opposition (document # 35) and Defendant's reply (document # 38) have also been filed and considered. The court heard oral arguments on the motion on April 13, 1992. The motion is now ripe for the court's decision.

## BACKGROUND

Although the Plaintiff alleges six separate claims in her complaint, this is essentially a products liability case. Plaintiff had oral surgery for the purpose of correcting defects in her temporomandibular joint ("TMJ"). As part of this procedure, her surgeon placed in her jaw a "Proplast TMJ Implant" manufactured by Vitek, Inc. ("Vitek"). Proplast is a registered tradename of Vitek for a porous compound made from polytetrafluoroethylene ("PTFE") resins and fibers, along with other ingredients, through a Vitek-patented process. Vitek used Proplast in many different types of medical devices, including the TMJ implant at issue here. Although the Proplast TMJ implant was approved for sale by the United States Food and Drug Administration ("FDA"), it allegedly caused severe personal injury to Plaintiff who continues to undergo treatment for her TMJ condition.

DuPont did not manufacture the Proplast TMJ implant. Instead, DuPont provided the raw PTFE that was used in the Proplast fabrication process. According to

1. As of the time of this order, DuPont had also filed identical summary judgment motions in nine other cases that are part of a larger group of cases that have been consolidated for discovery and scheduling before the Magistrate Judge. The case numbers of the nine other cases are: CV–N–89–334–ECR (PHA), CV–N–90–3–ECR (PHA), CV–N–90–220–ECR (PHA), CV–N–90–221–ECR (PHA), CV–N–90–222–ECR (PHA), CV–N–90–224–ECR (PHA), CV–N–90–225–ECR (PHA), CV–N–90–237–ECR (PHA), and CV–N–91–60–ECR (PHA).

DuPont, PTFE is a plastic raw material made by many raw material manufacturers and used safely in a variety of industrial applications. DuPont provided bulk PTFE in the form of small granules and in the form of "flock" (short fibers). According to the Proplast patent, PTFE in its two raw forms is mixed with carbon fibers and salt in a seven-step manufacturing process which includes mixing, filtration, compression, rolling, sintering, leaching, and drying. The result is Proplast, a porous, fibrous material that fosters body tissue ingrowth.

DuPont did not participate in the development, testing, and manufacture of the Proplast TMJ implants.[2] In fact, DuPont claims that it told Vitek that DuPont PTFE was not made for medical use and that any person who wished to use DuPont polymers for any medical or surgical purpose should rely on their own medical and legal judgment. DuPont claims that it provided this "disclaimer" to all medical companies as standard procedure, not just to Vitek. DuPont argues, therefore, that its only role in the development and use of Vitek's Proplast TMJ implants was as a bulk chemical supplier. Based upon authorities from other jurisdictions, DuPont claims that under the "bulk supplier doctrine" it owes no duty to warn the ultimate consumer of known dangers associated with its bulk product or its vendee's product. DuPont argues that only Vitek had a duty to warn the Plaintiff and that DuPont is entitled to summary judgment on the duty to warn issue as a matter of law.[3]

Plaintiff argues in opposition that, with respect to the negligence claim,

[a]s a matter of law DuPONT owed these duties to exercise reasonable care: in manufacture, in design, in instruction, in warning, in research and in testing. Paragraph 14 of the Amended Complaints alleges negligent design, negligent failure to warn and instruct, and negligent research and testing. DuPONT's Motion addresses the duty to warn only. It does not address these other listed alleged duties and their breach.

Plaintiff also argues that the duty to warn issue is irrelevant under a proper strict liability analysis. The opposition brief addresses DuPont's brief warranty and misrepresentation arguments as well.

## DISCUSSION

### I. *Products Liability Law*

Before the court may pass upon the specific factual issues now pending on summary judgment, it must briefly consider the relevant legal doctrines implicated by this case. Wherever Nevada products liability law is incomplete, the court must put itself in the position of the Nevada Supreme Court and endeavor to decide each state law issue as would the state's highest court. With this in mind, the court now considers the threshold legal questions.[4]

First, the court must decide whether the "duty to warn" issue is relevant only to the negligent failure to warn claim, or whether is it also relevant to the court's analysis of the strict liability claim as well. In other words, there may not be any appreciable difference between an action for negligent failure to warn and an action in strict prod-

---

**2.** Plaintiff contends, however, that since DuPont's tradenames appeared on some of Vitek promotional materials, DuPont actively participated in the marketing of the Proplast TMJ implants. The court need not resolve this question to decide the duty to warn issue. Furthermore, the facts are disputed as to the extent of DuPont's exact involvement with Vitek. The court is convinced on the record before it, however, that DuPont did not manufacture the implants nor provide them directly to doctors or patients, and thus, Plaintiff's contention that DuPont was involved in marketing the implants is irrelevant to the issue of DuPont's duty. To the extent that the marketing issue is relevant to

the question of express or implied warranty, it will be discussed below.

**3.** DuPont also makes brief arguments concerning the warranty and misrepresentation claims. These will be discussed below. The major issues on summary judgment are, however, whether DuPont had a duty to warn Plaintiff, and if so, whether DuPont met that duty.

**4.** For the sake of time and efficiency the court denies Plaintiff's request to certify the state law issues before the Nevada Supreme Court. It is common for a district court to decide state law issues as it thinks its highest state court would.

ucts liability for a defect due to insufficient warning.

Second, the court must determine whether Nevada would recognize the so-called "bulk supplier" defense which allows a provider of raw materials in certain instances to rely on its vendee/intermediary to provide the necessary safety warnings to the ultimate user of the product made by the vendee from the supplier's bulk materials. If Nevada recognizes the doctrine and it applies to DuPont, DuPont would have had no legal duty in Nevada to provide warnings to the Plaintiff or any other user of the Proplast TMJ implants.

Finally, the court must consider whether there exist other theories under which DuPont could be held liable in negligence or strict liability apart from a failure to warn. Plaintiff's complaint alleges that DuPont breached other duties besides its duty to warn and that the PTFE was defective in ways other than due to inadequate warning.

A. Is there a practical difference between negligence and strict liability in the failure to warn area?

■ Many courts and commentators argue that there is no practical difference between an action in negligence for breach of one's duty to warn and an action in strict liability for a product defect due to inadequate warning or labeling. See *Sara Lee Corp. v. Homasote Co.*, 719 F.Supp. 417, 420 (D.Md.1989); *Higgins v. E.I. DuPont de Nemours, Inc.*, 671 F.Supp. 1055, 1059–60 (D.Md.1987); *Nigh v. Dow Chemical Co.*, 634 F.Supp. 1513, 1517 (W.D.Wis. 1986); *Shell Oil Co. v. Gutierrez*, 119 Ariz. 426, 581 P.2d 271, 279 (1978) (citing *Hall v. E.I. DuPont de Nemours & Co., Inc.*, 345 F.Supp. 353, 368 (E.D.N.Y.1972)); Amer. L.Prod.Liab. (Third) § 32.53, at 90–93 (1987) [hereinafter "Prod.Liab."]; Note, *"Failures to Warn and the Sophisticated User Defense,"* 74 Va.L.Rev. 579, 583 n. 18 (1988) [hereinafter *"Failures to Warn"*]; Note, *"Special Project: An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation,"* 36 Vand. L.Rev. 573, 593 (1983). This court agrees.

An action in negligence for failure to warn derives from Restatement (Second) of Torts § 388:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel ... or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) *fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.*

(Emphasis added). It is subsection (c) which forms the basis of the negligent failure to warn action. Clearly § 388 contemplates standard negligence notions such as duty, breach, and foreseeability. Plaintiff does not dispute this.

Traditionally, however, courts have looked to § 402A of the Restatement in the context of products liability cases. The section is classified as a "strict liability" tort since liability is automatic once the plaintiff has proven all elements of his or her claim. The section reads:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.[5]

Nevada initially recognized the strict products liability doctrine by judicial decree in *Shoshone Coca–Cola Bottling Co. v. Dolinski*, 82 Nev. 439, 420 P.2d 855 (1966). As is the case in at least five other jurisdictions as well, the Nevada formulation is based on California common law. See *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963). However, in subsequent cases, the Nevada Supreme Court has often looked to Restatement § 402A for guidance in resolving products liability issues. *See, e.g., Outboard Marine Corp. v. Schupbach*, 93 Nev. 158, 561 P.2d 450 (1977) (failure to warn case); *General Electric Co. v. Bush*, 88 Nev. 360, 498 P.2d 366 (1972) (same). In light of Nevada's explicit recognition of § 402A, particularly in failure to warn cases, the court concludes that the Restatement is authoritative in this jurisdiction.

Although § 402A is classified as a strict liability tort, many courts and commentators have pointed-out its "negligence-like" feel with respect to an alleged failure to warn.

Many courts have examined and compared the application of strict liability and negligence theories and concluded that there is sometimes little, if any, difference between the 2 theories in the failure to warn context. Under both theories the duty to warn rests on the negligence concept of foreseeability ... [and] recovery ultimately depends upon ... what constitutes reasonable warning. ...

Thus, it has been said that the test of liability for failure to warn still contains a standard of reasonableness.

The discussion of duty to warn closely resembles the law of negligence, even in a strict liability action since the language in concepts of reasonableness which determine unreasonable risk under the Restatement of Torts 2d § 402A are the same concepts used in the negligence case. ... [I]t has been held that the standard applicable to the duty to warn in strict liability cases is based upon concepts of negligence; if the failure to warn is not negligent, the product is not "defective," and there is no strict liability.

Prod.Liab. § 32:53, at 90–92 (footnotes omitted). The Nevada Supreme Court has even approved of this "reasonableness" approach in assessing the conduct of defendants in § 402A products liability cases. See *Bush*, 88 Nev. at 364–65, 498 P.2d 366.

The court, therefore, concludes that for purposes of considering Defendant's possible liability for failure to provide an adequate warning, Plaintiff's negligence and strict liability claims should be considered together. As one district judge succinctly put it, "[t]he Court will leave the task of distinguishing between negligence and strict liability in the duty to warn to those who count angels on the heads of pins." *Nigh*, 634 F.Supp. at 1517. Thus, the court's rulings below on the issue of duty to warn and on the issue of the bulk supplier defense are just as relevant to the strict liability claim as they are to the negligence claim.[6]

---

**5.** It is interesting to note the drafters' caveat which appears below the text of the rule:

> The Institute expresses no opinion as to whether the rules stated in this Section may not apply
> (1) to harm to persons other than users or consumers;
> (2) to the seller of a product expected to be processed or otherwise substantially changed before it reaches the user or consumer; or
> (3) to the seller of a component part of a product to be assembled.

All three caveats are arguably relevant to this case in some way, but the court does not here decide these issues.

**6.** It is true that the two claims may differ with respect to common law defenses, especially in the area of contributory negligence. *Failures to Warn*, at 583 n. 18. For this reason the formal dichotomy between the two causes of action should be preserved for trial. However, the issue of contributory negligence is not relevant to the court's decision regarding the issues presented on summary judgment.

B. The "bulk supplier doctrine" defense

Many jurisdictions recognize the so-called "bulk supplier doctrine."[7] "Under this defense, a bulk supplier who supplies a dangerous product to a sophisticated purchaser cannot be held liable for not warning the ultimate users of the product of its dangers." *Sara Lee*, 719 F.Supp. at 420.

The court is confident that if faced with the issue, the Nevada Supreme Court would adopt some form of the bulk supplier doctrine. Almost every court that has considered the question has so ruled. Therefore, the difficult question for this court is what *form* of the doctrine to adopt. Fortunately, many courts in other jurisdictions have already formulated their own versions of the doctrine.

The court first notes the policy reasons behind having such a doctrine. In the case of the bulk materials supplier and its vendee/intermediary who actually manufactures the finished product, it is almost always the case that the intermediary is in a better position to warn the ultimate consumer of dangers than is the bulk supplier. There are duties elsewhere in the law that require the intermediary as manufacturer and retail marketer to safely design the product, test it, and provide its own adequate warning of any unavoidable inherent dangers. It would be wasteful, and at times counter-productive, for courts to require the bulk supplier to duplicate these efforts.

In some instances, the bulk supplier could not possibly perform these tasks anyway. For example, some chemicals and materials are sold and delivered in large truck- or boxcar-loads. A warning attached to such deliveries could not reasonably be expected to reach the ultimate consumer. In other cases it might even be physically impossible to attach a warning to certain materials. Finally, the bulk supplier usually has no control over the marketing, labeling, and distribution of the final product.

However, these factors do not lead to the conclusion that a bulk materials supplier may passively stand-by. Certainly, any useful version of the bulk supplier doctrine would require the bulk supplier to be reasonably sure that its vendee knew of the dangers inherent in the supplier's bulk product and planned to warn users about them. Once the vendee/intermediary had the requisite knowledge, it could then fulfill its own duties to the consumer or user. With this in mind, the court turns to the relevant authorities.

The District of Maryland has done the most to develop and refine the bulk supplier doctrine. Sitting in diversity and applying state law, the Maryland district has, in more than a few cases, found occasion to apply the doctrine. In *Higgins v. E.I. DuPont de Nemours, Inc.*, 671 F.Supp. 1055 (D.Md.1987), two bulk suppliers, Eastman and Union Carbide, provided raw chemicals to defendant DuPont who "incorporated the chemical[s] along with other ingredients into a proprietary formulation known as Imron, which it marketed in its own packaging and labeling...." *Id.* at 1057 (citing Union Carbide's motion for summary judgment). Imron was a paint used by the fire department and its fumes caused respiratory problems.

7. *See, e.g., Donahue v. Phillips Petroleum Co.,* 866 F.2d 1008 (8th Cir.1989) (interpreting Missouri law); *Mason v. Texaco, Inc.,* 862 F.2d 242 (10th Cir.1988) (Kansas law); *Manning v. Ashland Oil Co.,* 721 F.2d 192 (7th Cir.1983) (Illinois law); *Smith v. Walter C. Best, Inc.,* 756 F.Supp. 878 (W.D.Penn.1990); *Cimino v. Raymark Industries, Inc.,* 739 F.Supp. 328 (E.D.Tex.1990); *Cohen v. Steve's Ice Cream,* 737 F.Supp. 8 (D.Mass.1990); *Sara Lee Corp. v. Homasote Co.,* 719 F.Supp. 417 (D.Md.1989); *Higgins v. E.I. DuPont de Nemours, Inc.,* 671 F.Supp. 1055 (D.Md.1987); *Nigh v. Dow Chemical Co.,* 634 F.Supp. 1513 (W.D.Wis.1986); *White v. Weiner,* 386 Pa.Super. 111, 562 A.2d 378 (1989); *Rivers v. AT & T Technologies, Inc.,* 147 Misc.2d 366, 554 N.Y.S.2d 401 (1990); *GEM Developers v. Hallcraft Homes of San Diego, Inc.,* 213 Cal. App.3d 419, 261 Cal.Rptr. 626 (1989); *Purvis v. PPG Industries, Inc.,* 502 So.2d 714 (Ala.1987); *Munoz v. Gulf Oil,* 732 S.W.2d 62 (Tex.App. 1987); *Lee v. Butcher Boy,* 169 Cal.App.3d 375, 215 Cal.Rptr. 195 (1985); *Zamora v. Mobil Oil Corp.,* 104 Wash.2d 199, 704 P.2d 584 (1985); *Venus v. O'Hara,* 127 Ill.App.3d 19, 82 Ill.Dec. 143, 468 N.E.2d 405 (1984); *Shell Oil Co. v. Harrison,* 425 So.2d 67 (Fla.App.1982), *cert. denied,* 436 So.2d 98 (Fla.1983); *Alm v. Aluminum Co. of America,* 717 S.W.2d 588 (Tex.1986); *Shell Oil Co. v. Gutierrez,* 119 Ariz. 426, 581 P.2d 271 (1978); *Jones v. Hittle Service, Inc.,* 219 Kan. 627, 549 P.2d 1383 (1976); *Walker v. Stauffer Chemical Corp.,* 19 Cal.App.3d 669, 96 Cal.Rptr. 803 (1971).

The district court first ruled that if faced with the issue, the Supreme Court of Maryland would adopt the bulk supplier doctrine. *Id.* at 1058–59 (citing *Goodbar v. Whitehead Bros.*, 591 F.Supp. 552 (W.D.Va.1984), *aff'd sub nom., Beale v. Hardy*, 769 F.2d 213 (4th Cir.1985)). Furthermore, although the doctrine originated in negligent failure to warn cases, the court determined that it was equally applicable to strict products liability cases as well. *Id.* at 1059–60. Since the vendee/intermediary clearly knew of the dangers posed by the chemicals provided by Eastman and Union Carbide and was in a far better position to warn the ultimate users of Imron, the movants' reliance on the intermediary to provide warnings was clearly reasonable. *Id.* at 1061–62. The court granted summary judgment in favor of Eastman and Union Carbide on the basis of the bulk supplier doctrine. *Id.* at 1062.

■ Unfortunately, the *Higgins* court failed to propound a general formulation of the bulk supplier doctrine for future cases. Instead, the result in the case was based on a careful analysis of the particular facts. However, in *Sara Lee Corp. v. Homasote Co.*, 719 F.Supp. 417 (D.Md.1989), the same district confronted the bulk supplier issue once again. This time the court narrowed the relevant inquiry in bulk supplier cases:

> It is clear from the decisions in *Goodbar* and *Higgins* that the bulk supplier/sophisticated user defense uses an objective, rather than a subjective, test in determining the sophistication of the purchaser. The question is whether the bulk suppliers could reasonably rely on the industrial purchaser to recognize the dangers associated with the product and to pass on warnings to end users. If the bulk suppliers of a product have reason to believe that the purchaser of the product [i.e. the intermediary] recognizes the dangers associated with the product, then it is the responsibility of the purchaser, not the suppliers, to warn against dangers.

> · · · · ·

> The focus of the bulk supplier/sophisticated user defense is not on the knowledge of the raw material suppliers, but rather on the knowledge of the industrial purchaser.

*Id.* at 424. Thus, the relevant question in bulk supplier cases is whether the bulk supplier was objectively reasonable in relying on a knowledgeable intermediary to provide a warning to ultimate users. This involves proof of two elements: 1) that the bulk supplier was reasonable in believing that the intermediary knew of the dangers associated with the bulk product, and 2) that the bulk supplier was reasonable in relying on the intermediary to warn the ultimate user of such dangers.

■ The major inquiry in most bulk supplier cases will concern the knowledge of the intermediary. This court believes that under the test outlined above, a bulk supplier must show that the intermediary knew of the dangers associated with the bulk product, or should have known of those dangers. There are many ways that a bulk supplier can satisfy this requirement.

First, the bulk supplier can offer proof that it explicitly informed the intermediary of the associated dangers. For example, the bulk supplier may "provide adequate instructions to the distributor next in line or ascertain that the distributor is informed as to the nature of the product and is in a position to convey the information ... [to] the ultimate consumer...." *Donahue v. Phillips Petroleum Co.*, 866 F.2d 1008, 1012 (8th Cir.1989). Second, the bulk supplier "fulfills his duty to the ultimate consumer when he ascertains that the distributor to whom he sells is adequately trained, is familiar with the properties of the [product] and safe methods of handling it, and is capable of passing on his knowledge to his customers." *Mason v. Texaco, Inc.*, 862 F.2d 242, 246 (10th Cir.1988) (citing *Jones v. Hittle Service, Inc.*, 219 Kan. 627, 549 P.2d 1383, 1394 (1976)).

Whatever the facts are in any particular case, the authorities seem to impose on the bulk seller a duty to take some reasonable, affirmative steps to ensure that its vendee/intermediary is knowledgeable and fully equipped to provide adequate warn-

ings to ultimate users. Simply put, "[t]he issue in every case is whether the original [bulk] manufacturer has a reasonable assurance that its warning will reach those endangered by the use of its product." *Cimino v. Raymark Industries, Inc.*, 739 F.Supp. 328, 331 (E.D.Tex.1990) (citing *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 591–92 (Tex.1986)). However, the doctrine

> does not impose a duty on the bulk seller to warn the ultimate consumer, and specifically does not impose a duty on the bulk seller to police the adequacy of warnings given by the distributor. "If the product is sold in bulk, adequate warning to the vendee is all that can reasonably be required."

*Mason*, 862 F.2d at 246 (quoting *Jones*, 549 P.2d at 1393).

■ In summary, this court is confident that the Nevada Supreme Court would adopt the bulk supplier defense in negligent failure to warn cases as well as in strict products liability cases.[8] For Defendant DuPont to succeed with its bulk supplier doctrine defense in the instant case, it will have to show that it reasonably relied upon Vitek's knowledge of the risks involved with using PTFE in medical implants and that it also reasonably relied upon Vitek to warn implant patients of those dangers. To do this, DuPont must show that it took some reasonable, affirmative steps to ascertain that Vitek was a knowledgeable intermediary. Such steps must rise above the level of a mere disclaimer but need not go so far as to have required DuPont to second-guess Vitek's actions in carrying-out its own duty to warn.[9]

## C. Other negligence and strict liability theories

### 1. Negligence

■ In addition to negligent "failure to warn and instruct" Plaintiff also charges DuPont with negligent design and negligent failure to research and test. These claims have no legal basis and are subsumed by the failure to warn issue. As this court reads the relevant bulk supplier cases, DuPont will only be liable if it was unreasonable in relying on Vitek to provide warnings.

As for the first point, negligent design, there is no evidence (or even allegation) that DuPont designed PTFE for use in medical implants. *Vitek* adapted PTFE to this use. Thus, although the court need not now reach this issue, one would be hard-pressed to convince the court that DuPont had a duty, grounded in negligence, to

---

**8.** Plaintiff made a strong effort at oral argument to characterize this case as a component part manufacturer case and not a bulk supplier case. Plaintiff claimed that the bulk supplier doctrine is "easier" on defendants, but when taken to task on the issue, Plaintiff could not articulate any practical difference between the two lines of cases. This argument is of no significance. First, the version of the bulk supplier doctrine that the court adopts here today leads to the exact same result as would the component parts cases. *See, e.g., Childress v. Gresen Mfg. Co.*, 888 F.2d 45, 48–49 (1989) where the provider of a non-defective component part incorporated by the manufacturer into an unsafe product had no duty, independent of the manufacturer's, to analyze the design of the completed product, as this would have either required the component provider to retain experts and have greater knowledge than the manufacturer or would have given the component manufacturer the incentive to remain ignorant. This court reads *Childress* as implicitly requiring the component provider only to make reasonably sure that the manufacturer (i.e. intermediary) lives up to *its* duties, but no more. This is the same result that this court reaches in the instant case.

Second, Plaintiff's argument that the bulk supplier doctrine only applies to suppliers of "raw" materials such as non-patented chemicals, ores, etc. that are but one ingredient in a final product of a much different form is belied by the cases. Many bulk supplier cases involve bulk products that are themselves complicated or finished products. Other bulk supplier cases involve bulk products that are hardly changed at all by the intermediary. It is the positions of the bulk supplier and the intermediary relative to the user that impacts on the duty to warn, not whether a product is "raw" or "finished."

**9.** Some courts have required the bulk supplier to fulfill more of a "watchdog" role with respect to the intermediary's duty to warn. *See, e.g., Nigh v. Dow Chemical Co.*, 634 F.Supp. 1513, 1517 (W.D.Wis.1986) (defendant required to give warning that could be passed along by intermediary to ultimate user). This court declines to delineate any rule that would force the bulk supplier to do the intermediary's work for it.

design materials for applications that it neither contemplated nor intended at the time of design.[10] PTFE has a wide-variety of industrial and commercial applications not specifically discovered or exploited by DuPont. It would run counter to logic to say that the designers of PTFE could be negligent for failing to design a chemical that would be safe in all of those applications. Any negligence would have to lie in the PTFE user who discovered and designed the new application.[11]

Additionally, the court knows of no legal precedent for the proposition that a bulk supplier must duplicate the product manufacturer's research and testing. In fact, the bulk supplier doctrine is grounded in the policy that it makes no sense to require the bulk supplier to duplicate the efforts of the intermediary who, in this case, makes a new product (one that the bulk supplier does not itself make) from the raw materials.

Plaintiff's additional negligence theories do not seem to apply to Defendant DuPont in this case. It is of no import that DuPont did not address those theories in its motion for summary judgment.

### 2. Strict liability

Plaintiff argues in her opposition to summary judgment that no only was the TMJ implant defective, but that the DuPont PTFE was itself defective. The Plaintiff also argues in her amended complaint that DuPont is liable in strict products liability for some defect in the PTFE apart from DuPont's alleged failure to warn of its dangerous properties, namely for design and manufacturing defects.

There are only three ways that a product may be defective (i.e. "unreasonably dangerous") under Restatement (Second) of Torts § 402A: design defect, manufacturing defect, and defective due to failure to warn. Prod.Liab. § 16:1, at 11. No one disputes that the present case mainly concerns the last category, failure to warn. Nor has Plaintiff alleged facts that would support the second category, manufacturing defect, since there is no evidence that DuPont made the PTFE "wrong." Thus, Plaintiff's only other possible argument is that DuPont defectively designed the PTFE.

The court has already explained above why the logic of the design defect argument is inapplicable here. The rationale behind the conclusion above that it makes no sense to talk in terms of DuPont's "negligent design" is just as applicable in the area of strict liability for design defects since any test for design defect will undoubtedly involve a negligence-like reasonableness test. *Id.* § 28:3, at 17; § 28:6, at 19. Also, since the test for design defect requires the finder of fact to consider the designer's conscious design choices and the foreseeable risk of harm based on common industry knowledge, see *id.* §§ 28:1–28:2, at 13–15, it would be inapposite to impose strict liability for a use of PTFE not contemplated or known of at the design stage.[12] Again, Defendant appropriately addressed only the failure to warn issue.

### II. *The Motion for Summary Judgment*

#### A. The failure to warn issue

Defendant DuPont claims that if the court adopts the bulk supplier doctrine, then it is entitled to summary judgment on the failure to warn claims as a matter of law. The court does not agree.

---

**10.** Plaintiff focuses on the allegation that DuPont knew of the specific use that Vitek was to put PTFE. Although this point will most likely be of major significance at trial, it would not, however, impact on any claim of negligent *design* since Vitek, and Proplast, did not exist at the time that PTFE was invented.

**11.** The court is reminded of the example of DMSO. DMSO was quite popular about ten years ago as a topical remedy for muscle aches, arthritis, and other forms of pain. However, DMSO was designed as an industrial solvent.

Certainly a claim of negligent design centered around the side-effects of the "medicinal" use of DMSO could not be sustained against the chemists who invented DMSO as an industrial solvent. Such a claim, the court imagines, could only be brought against those that adapted DMSO to its medicinal use.

**12.** Nor is there any allegation that PTFE is per se an "ultrahazardous" or "unreasonably dangerous" material in and of itself. In fact, Plaintiff conceded this fact at oral argument.

When faced with a defendant's motion for summary judgment, the evidentiary material before the court "must be viewed in the light most favorable to the [nonmoving] party," *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The court's role is simply to assess whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511. If the nonmoving party is unable to meet this burden, the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c).

The relevant factual inquiry with respect to the duty to warn issue as modified by the bulk supplier doctrine will be one of reasonableness.

> Whether a product is "defective" or "unreasonably dangerous" because of a failure to warn "... depends on the same considerations respecting harm ... discussed in the context of negligence...."
>
> . . . . .
>
> The determination as to whether the supplier's duty measured by these considerations has been reasonably discharge [sic] comes within the function of the trier of fact.

*Shell Oil*, 581 P.2d at 279 (quoting *Hall v. E.I. DuPont de Nemours Co., Inc.*, 345 F.Supp. 353, 368 (E.D.N.Y.1972)). Thus, as with all negligence cases, the trier of fact must judge the reasonableness of Defendant's acts and omissions.

DuPont claims that the evidence shows that Vitek knew of the dangers associated with the use of PTFE in medical implants. DuPont cites scientific research and their own letter to Vitek as evidence of this. Although this evidence will undoubtedly play a key role at trial, the court cannot say as a matter of law that it is uncontroverted, nor can the court conclude, looking at the evidence in the light most favorable to the Plaintiff, that there is no material issue of fact.

The issues associated with the bulk supplier doctrine make summary judgment on *any* record highly questionable. Whenever the main inquiry is the reasonableness of a party's actions or omissions it is uniquely the province of the trier of fact to make that determination, unless *no* reasonable jury could rule in favor of the nonmoving party. Since in the judgment of the court a reasonable jury could decide either way based on the present record, the court must deny Defendant's motion for summary judgment on the negligence and strict product liability claims.

### B. The warranty claims

#### 1. Express warranty

As a matter of law, the court can imagine no situation where the bulk supplier of a raw material could ever be liable for making an express warranty relating to safety to the user of a product made by another from the bulk product. *Higgins*, 671 F.Supp. at 1063. To even allege such a cause of action the Plaintiff would have to claim that DuPont expressly told Plaintiff (orally or in writing) that PTFE was safe for use by Vitek in Proplast TMJ implants and that the implants themselves were safe. Even if some evidence of this existed (it does not), the court fails to see how A can expressly promise to B that C's product will be safe.[13] The court grants summary judgment in favor of DuPont on this claim.

#### 2. Implied warranty

Under the Uniform Commercial Code ("UCC"), adopted by Nevada and set out at NRS Chapter 104, there are two types of implied warranties: the implied warranty of merchantability (NRS 104.2314; UCC 2–314) and the implied warranty of fitness for a particular purpose (NRS 104.2315; UCC

---

**13.** Plaintiff admits in its points and authorities that there is no evidence that DuPont approved of or acquiesced in the use of its tradename "Teflon" in Vitek advertising materials. Even if it did, that would not establish that DuPont expressly warranted to the Plaintiff that Proplast implants were safe.

2–315). Plaintiff alleges only an implied warranty of merchantability in her complaint, as the implied warranty of fitness for a particular purpose is clearly not at issue in this case.

Undoubtedly the resolution of this claim will turn on subsection 1.(c) of NRS 104.-2314 which defines "merchantable" as "fit for the ordinary purposes for which such goods are used...." Plaintiff's argument would be that, notwithstanding DuPont's disclaimer letter to Vitek, the act of selling PTFE to a known medical implant manufacturer created the expectation that one of PTFE's "ordinary purposes" was its use in medical implant materials. PTFE was not fit for that use, the argument goes, so thus, PTFE (in this case) was not merchantable and the implied warranty was breached.

This argument is logically tenable and cannot be dispelled on summary judgment. Given the fact that Nevada does not require vertical privity in products liability cases based on implied warranty, *Zaika v. Del E. Webb Corp.*, 508 F.Supp. 1005, 1012 (D.Nev.1981), the claim rests completely on factual issues. Considering the evidence in the light most favorable to the nonmoving party, the court concludes that a genuine issue of material fact remains on the implied warranty issue. Summary judgment is denied on this claim.

## C. The misrepresentation claims

### 1. Strict liability

 The court is unaware of any theory of "strict liability" for misrepresentation. The tort of "misrepresentation" in Nevada (and most jurisdictions) must be based either on intentional conduct (also called "fraud"), see *Lubbe v. Barba*, 91 Nev. 596, 599, 540 P.2d 115, 117 (1975), or negligent conduct, see *Bank of Nevada v. Butler Aviation O'Hare*, 96 Nev. 763, 764, 616 P.2d 398, 399 (1980). The court will consider "negligent misrepresentation" below. However, as to the first misrepresentation claim, the court doubts that any jurisdiction imposes "strict liability" (i.e. no required mental state) for misrepresentations. This cause of action fails to state a cognizable

legal claim and the court grants DuPont's motion for summary judgment on this issue.

### 2. Negligence

 Nevada has adopted the Restatement view of negligent misrepresentation:

§ 552. Information Negligently Supplied for the Guidance of Others

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information *for the guidance of others in their business transactions,* is subject to liability *for pecuniary loss* caused to them by their justifiable reliance upon the information if he fails to exercise reasonable care or competence in obtaining or communicating the information....

(Emphasis added). See *Bank of Nevada,* 96 Nev. at 764, 616 P.2d 398 (citing § 552 of the Restatement).

It is clear from this passage that the tort is only available to those suffering pecuniary injury in the context of a business transaction. As such, the facts of the instant case do not support even the allegation of negligent misrepresentation nor could Plaintiff recover damages for personal injury. This claim fails to state a cause of action and the court grants summary judgment in favor of Defendant DuPont on this issue.

## CONCLUSION

Although the court agrees with Defendant DuPont that the bulk supplier doctrine is relevant and applicable to this case, it does not agree that summary judgment is warranted on the failure to warn issue. The trier of fact will have to determine if DuPont's actions were reasonable on the issues of negligent failure to warn and strict liability for a defective product due to failure to warn. The court can conceive of no other possible negligence or strict liability claim that Plaintiff can sustain in the product liability context other than failure to warn.

On the express warranty claim, the court agrees with Defendant that, as a matter of law, a bulk supplier cannot expressly warrant that its intermediary's product will be safe. Even on the facts, Plaintiff has presented absolutely no evidence that Du-Pont expressly represented anything to the Plaintiff. DuPont is entitled to summary judgment on the express warranty claim. However, as to any implied warranty of merchantability, factual issues remain unresolved, and summary judgment on the implied warranty theory is not appropriate.

Finally, both of Plaintiff's misrepresentation claims—one for strict liability and the other for negligence—fail to state legal claims upon which relief may be granted. As such, Defendant is entitled to summary judgment on both.

IT IS, THEREFORE, HEREBY ORDERED that Defendant's motion for summary judgment (document # 28) is GRANTED with respect to Plaintiff's second, fifth and sixth claims, for express warranty, strict liability-misrepresentation, and negligent misrepresentation respectively. Said motion is DENIED with respect to Plaintiff's first, third, and fourth claims, for negligence, implied warranty, and strict product liability.