Marilyn **HEGNA**, Plaintiff,

v.

**E.I. du PONT de NEMOURS AND
COMPANY, Defendant.**

Civ. No. 4–91–678.

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 12, 1992.

Ronald S. Goldser, and Zimmerman
Reed, Minneapolis, Minn., for plaintiff.

William F. Forsyth, Cheryl Hood Langel, and Henson & Efron, P.A., Minneapolis, Minn., and Shelley K. Wessel, Patricia M. Lucas, and Brown & Bain, Palo Alto, Cal., for defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on defendant E.I. du Pont de Nemours and Company's ("DuPont") motion for summary judgment on plaintiff Marilyn Hegna's ("Hegna") negligence, strict liability, breach of warranty and misrepresentation claims. Based on a review of the file, record and proceedings herein, DuPont's motion for summary judgment will be granted in part and denied in part.

## BACKGROUND

The present action arises from alleged defects in implants that Hegna received during surgery on her temporomandibular joints ("TMJ"), which are located in the jaw.[1] Hegna's surgeon implanted TMJ prostheses manufactured by Vitek, Inc. ("Vitek").[2] The implants were made out of Proplast[3], a porous and fibrous compound that fosters body tissue ingrowth. Proplast is made in an eight-step process by mixing polytetraflouroethylene ("PTFE")[4] resins and fibers with other various materials.[5] Vitek purchased its PTFE from DuPont.

Hegna alleges that her implants eventually disintegrated, that she was injured by the PTFE particles remaining after the disintegration and that DuPont is liable for her injuries. Hegna claims that as early as 1967, DuPont was aware of various studies questioning the propriety of using PTFE in medical implants for weight bearing joints because of PTFE's wear and deformation, which would ultimately result in a subject suffering "severe foreign body reaction."[6] She further contends that DuPont knew that Vitek was using PTFE to make its jaw implants, and thus, DuPont had a duty to warn her or her physician of the risks involved in using PTFE for such implants. Hegna argues that her injuries could have been avoided if DuPont had properly discharged its duty to warn. Hegna thus filed the present suit against DuPont, asserting claims for negligence and strict liability.

In her original complaint, Hegna also asserted claims for breach of warranty and misrepresentation and DuPont moves for summary judgment on those claims. Hegna, however, has subsequently submitted an amended complaint omitting those claims,[7] and does not oppose DuPont's motion for summary judgment to the extent that it relates to those claims.

DuPont also moves for summary judgment on Hegna's negligence and strict liability claims. DuPont contends that Hegna's negligence claim fails because DuPont

---

1. Plaintiff received her implants on January 28, 1985 (left side) and May 10, 1985 (right side). The implants were removed on February 20, 1986 (right side) and April 17, 1986 (left side).

2. Vitek filed for bankruptcy on June 7, 1990. Presumably, Hegna did not name Vitek as a defendant because of the bankruptcy.

3. Proplast is Vitek's registered trade name for the compound.

4. PTFE is a teflon fiber or resin.

5. Charles Homsy, Vitek's president, patented the process for making Proplast. *See* Wessels Aff. Exh. 1 (U.S. Patent No. 3992725). Proplast is made by:
   1. Mixing PTFE particulate resin, PTFE resin fibers, carbon fibers, and sodium chloride;
   2. Vacuum filtering the mixture;
   3. Compressing the mixture at between 50 and 3000 pounds per square inch;
   4. Rolling the compressed mixture through the nip of heated rolls;
   5. Drying the mixture to make sure that any residual solvent evaporates;
   6. Sintering the mixture in a heated press at temperatures between 610 and 680 degrees fahrenheit and at pressure between 50 and 5800 pounds;
   7. Leaching the mixture to dissolve out the water soluble filler material; and
   8. Redrying the mixture in an oven.
   *Id.*

6. Van Norman Aff. Ex. F (article by John Charnely, a surgeon who had conducted a study using PTFE in hip joints of dogs).

7. Hegna, however, has not moved the court for permission to file her amended complaint.

played no role in the design, manufacture or sale of the Proplast TMJ implant, but merely supplied Vitek with raw materials, unaware of Vitek's intended use or any risks involved in such use. DuPont thus contends that it acted as a bulk supplier and, as such, had no legal duty either to ascertain whether Vitek's specialized use of PTFE was safe or to warn Hegna or her physician of any potential dangers associated with the use of PTFE for such implants. DuPont further contends that it had no duty to warn because the Food and Drug Administration ("FDA"), the agency responsible for regulating the safety of implants, approved the use of PTFE for Proplast TMJ implants and regulated their sale. DuPont argues that the FDA's approval and regulation relieved it of any duty to warn that it might have had. DuPont also contends that Vitek was obligated under federal law and FDA regulations to develop appropriate warnings and to ensure that Hegna's physician received those warnings, and therefore, it would be superfluous to impose a second duty to warn on DuPont. In the alternative, DuPont contends that it satisfied any duty that it may have had as a bulk supplier by warning Vitek that PTFE was not made for medical purposes, that DuPont had not conducted any tests to determine the efficacy of using PTFE in that manner and that Vitek would have to rely on its own medical and legal judgment if it chose to use PTFE for implants. Finally, Dupont contends that Hegna's strict liability claim fails because Vitek's Proplast processing altered the chemistry, composition and mechanical properties of the raw PTFE. DuPont thus moves for summary judgment on Hegna's negligence and strict liability claims.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This stan-

dard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which requires the trial judge to direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Stated in the negative, summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. On a motion for summary judgment, all evidence and inferences are to be viewed in the light most favorable to the nonmoving party. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552–53. With this standard at hand, the court will consider DuPont's motion for summary judgment.

### 1. *Hegna's Negligence Claim*

■ Hegna alleges DuPont was negligent because it failed to warn her or her physician about the potential risk of using PTFE for medical implants. Hegna contends that she would not have been injured if DuPont had provided such warnings because she would have refused implant surgery. DuPont contends, however, that under the bulk supplier doctrine, suppliers who sell raw material to sophisticated man-

ufacturers have no duty to warn ultimate users of any dangers inherent in the finished product. DuPont argues that if faced with the issues raised by the present case, a Minnesota court would apply that doctrine and hold that DuPont had no duty to warn, and that even if such a duty were imposed, DuPont discharged that duty.[8]

Negligence actions based on a failure to warn generally arise under section 388 of the Restatement (Second) of Torts ("section 388"), which provides that:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel ... or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Restatement (Second) of Torts* § 388 (1965). "[W]hether a legal duty to warn exists is a question of law for the court." *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn.1986) (citing W. Page Keeton et al., *Proesser and Keeton on The Law of Torts*, § 37, at 236 (5th ed. 1984); *Restatement (Second) of Torts* § 388(b) (1965)). To make this determination:

the court goes to the event causing the damage and looks back to the alleged negligent act. If the connection is too remote to impose liability as a matter of public policy, the courts then hold there is no duty, and consequently no liability. On the other hand, if the consequence is direct and is the type of occurrence that was or should have been reasonably foreseeable, the courts then hold as a matter of law a duty exists. Other issues such as adequacy of the warning, breach of duty and causation remain for jury resolution.

*Id.* at 924–25 (citing *Christianson v. Chicago, St. Paul, M. & O. Ry. Co.*, 67 Minn. 94, 69 N.W. 640 (1896)).

Comment n to section 388 of the Restatement, which specifically addresses the duty to warn third parties, sets forth additional factors that may be considered when evaluating whether to impose a duty to warn, for example:

(1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warning given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burden imposed on the supplier by requiring that he directly warn all users.

*Goodbar v. Whitehead Bros.*, 591 F.Supp. 552, 557 (W.D.Va.1984) (construing section 388(c) and comment n), *aff'd*, 769 F.2d 213 (4th Cir.1985)).

Examining those factors, the court first concludes that as a matter of public policy, the connection between Hegna's injury and DuPont's actions is not too remote to impose a duty to warn because there is evidence that DuPont was aware of both Vitek's intended use [9] and the potential risks

---

**8.** For a list of cases in which courts have applied some form of the bulk supplier doctrine, *see Forest v. E.I. DuPont de Nemours & Co.*, 791 F.Supp. 1460, 1465 n. 7 (D.Nev.1992).

**9.** Hegna presents evidence that DuPont knew that Vitek was using PTFE for its implants. For example, on October 5, 1972, John Ostroot, a DuPont sales representative reported:

Homsy's new "Teflon"/carbon implant material called "PROPLAST" has been licensed to Smith, Kline & French and appears to have

obtained acceptance in a wide range of human implant applications. Vitek will shortly be producing basic shapes of "PROPLAST" to supply every hospital in the world.

Van Norman Aff. Exh. V (Call Report of John Ostroot dated Oct. 5, 1972).

On May 13, 1977, J.B. Armitage, an employee in DuPont's Patents and Regulatory Affairs Division, sent a letter to Vitek reminding it that DuPont did not market medical or surgical grades of teflon resins and requested that Vitek sign a medical release before DuPont would sell

involved in using PTFE for such implants.[10] *Cf. Todalen v. United States Chem. Co.*, 424 N.W.2d 73, 78–80 (Minn.Ct.App.1988) (rejecting sophisticated user defense and finding that bulk chemical supplier had duty to warn not only employer but also the ultimate user, an employee, where it was unclear whether the employee had adequate knowledge of dangers involved in the misuse of supplier's product). The court further determines that the magnitude of the risk involved in using PTFE for implants was substantial, that DuPont's reliance on Vitek as an intermediary may have been unreasonable and that injuries such as Hegna's may have been the direct and reasonably foreseeable consequence of using PTFE in such a manner. *Compare Independent School Dist. No. 14 v. Ampro Corp.*, 361 N.W.2d 138, 143 (Minn.Ct.App. 1985) (reversing directed verdict and finding that despite school's general knowledge that foam was flammable, both supplier of foam and manufacturer of foam mats had a duty to warn about foam's unusual flammability) *with Hart v. FMC Corp.*, 446 N.W.2d 194, 198 (Minn.Ct.App.1989) (finding manufacturer had no duty to warn employees because it had no knowledge of

employer's misuse of product and that misuse was not reasonably foreseeable); *see also Balder v. Haley*, 399 N.W.2d 77, 81 (Minn.1987) (the existence of a duty to warn depends on the resulting injury's foreseeability). The court thus concludes that if faced with the present situation, a Minnesota court would find that DuPont had a duty to warn at least Vitek of the possible dangers of using PTFE for jaw implants.

Relying on *Hill v. Wilmington Chem. Corp.*, 279 Minn. 336, 156 N.W.2d 898 (1968), DuPont nonetheless argues that under Minnesota law, it had no duty to warn or that it discharged any such duty. In *Hill*, the Minnesota Supreme Court addressed the parameters of a bulk chemical supplier's duty to warn. Plaintiff Hill was injured when a product that he was applying, a liquid water repellent, ignited. The manufacturer of the repellent, Wilmington, purchased the repellent's flammable ingredient, Sol B, from Shell Oil Company ("Shell"). Hill settled his negligence claim with Wilmington and Wilmington sued Shell for indemnification. In evaluating

---

PTFE to it. *Id.* Exh. Z (Letter from Armitage to Tellkamp).

On February 1, 1984, M.W. Bernhardt, another DuPont employee, reported that he obtained a study conducted by Homsy, Vitek's president, indicating that Vitek was using PTFE to make Proplast implants. *Id.* Exh. EE (Memorandum to File of M.W. Bernhardt dated Feb. 1, 1984).

**10.** The record before the court suggests that DuPont was aware of the existence of studies questioning the propriety of using PTFE in medical implants. For example, on March 13, 1967, George A. Wilkens, a consultant in DuPont's Technical Services Laboratory, sent a letter to C. Gonzalez, the purchasing agent at Methodist Hospital in Houston, Texas, in response to Charles A. Homsy's proposed purchase of teflon resins. Homsy, a former DuPont employee and eventual founder and president of Vitek, was Methodist Hospital's Coordinator for Development of Prosthetic Devices. Wilkens stated:

I should point out that DuPont "Teflon" is not made for medical use. While we carry out such tests as are needed to protect the ordinary users of our products, we do not perform the detailed long-time studies which should be made before these products are employed for purposes such as in medicine and surgery. Accordingly, we are reluctant to

encourage the use of "Teflon" for surgical purposes.

There is a growing awareness of the lack of basic knowledge concerning the properties of a synthetic material when it is used to replace ... body tissues. Moreover, articles have appeared in the United States ... report[ing] tissue reaction from abraded particles of ... [PTFE]....

Since we have no knowledge of the suitability of "Teflon" for your medical use, and since the contemplated use is one that you propose and has not been recommended by us, it must be understood that you are relying upon your own *medical judgment as to its safety and effectiveness*. Therefore, we will provide you with material that you ordering ... only on the understanding that you assume full responsibility for any consequences which may result directly or indirectly from its use.

Van Norman Aff. Exh. N (Letter from Wilkens to Gonzalez dated 3/13/67). Homsy responded to Wilkens letter on March 20, 1967, stating that the reports to which DuPont had directed the hospital's attention were "crucially incomplete" and that more recent studies indicated that medical applications of PTFE polymers "induce less tissue reaction than all other plastics commonly used in modern surgery." *Id.* Exh. O (Letter from Homsy to Wilkens dated 3/20/67).

Shell's duty to warn, the Minnesota Supreme Court determined that:

> [i]f Wilmington had adequate knowledge of the dangerous propensities of the product sold by Shell, no further duty rested on Shell to give additional warning.

*Id.* 156 N.W.2d at 902. The court reasoned that:

> This is not a case where a manufacturer of a product, through an intermediary, places the finished product upon the market. Shell had no contact with the ultimate user. It sold its product to Wilmington who, in turn, manufactured a finished product—with Shell's product as only an ingredient—and placed the finished product on the market. Shell had no opportunity or duty to warn the ultimate consumer. It neither packaged nor placed the product on the market. Wilmington prepared the label on the package giving warning as to the proper use of the product. Shell's duty was to inform Wilmington of dangers inherent in the use of Sol B not known to Wilmington. If Wilmington had adequate knowledge of the dangerous propensities of the product sold by Shell, no further duty rested on Shell to give additional warning.

*Id.* 156 N.W.2d at 902; *cf. Todalen,* 424 N.W.2d at 79 (extending bulk chemical supplier's duty to warn to employer and its employees despite employer's knowledge because "even an employer who is aware of direct effects of the chemical may be unaware of more subtle or diffuse risks", quoting *Hall v. Ashland Oil Co.,* 625 F.Supp. 1515, 1519–20 (D.Conn.1986)). The Minnesota Supreme Court further determined that Wilmington had adequate knowledge of the flammability of Shell's product and observed that if Hill had followed the instructions that Wilmington had placed on the repellent container "there probably would have been no accident." *Hill,* 156 N.W.2d at 902 n. 2. The Minnesota Supreme Court thus concluded that:

> Liability on the part of Shell, if there is any, must rest on its superior knowledge of the dangerous propensities of the product it supplied to Wilmington with knowledge of the use to which it was to be put. Inasmuch as the evidence is conclusive that Wilmington already had such knowledge, there would be no legal obligation on the part of Shell to furnish that knowledge.

*Id.* at 904.

■ The court, however, finds that the present case is distinguishable from *Hill* because there are material fact disputes concerning whether DuPont knew that Vitek was using PTFE for medical implants,[11] whether Vitek was aware of any potential danger in using PTFE to make implants, whether Vitek materially altered PTFE for such use, whether any disclaimer or warning given to Vitek by DuPont was sufficient to discharge DuPont's duty and whether DuPont could reasonably rely on Vitek to pass on any such warning.[12] *See*

---

11. DuPont contends that PTFE is not an inherently dangerous material and that it had no knowledge of Vitek's intended use, and thus it acted reasonably by merely issuing a disclaimer to Vitek. Under *Hill,* such lack of knowledge could serve as a defense. 156 N.W.2d at 904 ("Liability on the part of ... [the bulk supplier], if there is any, must rest on its superior knowledge of the dangerous propensities of the product it supplied ... [to the purchaser] with knowledge of the use to which it was to be put."). As previously discussed, however, the record suggests that DuPont may have known that Vitek was purchasing PTFE to make the Proplast TMJ implants and that DuPont may also have known that implants containing PTFE might not be suitable for their intended use, and thus the court rejects DuPont's arguments that it acted reasonably as a matter of law.

12. DuPont also relies on *Hart v. FMC Corp.,* 446 N.W.2d 194 (Minn.Ct.App.1989) and *Audetat v. Blaschke,* No. C4–89–434, 1989 WL 131560 (Minn.Ct.App. Nov. 7, 1989) to support its position that as a bulk supplier of PTFE, it had no duty to warn either Vitek, Hegna or her physicians. The court finds, however, that DuPont's reliance is misplaced. *Hart* is distinguishable because it involved a product that had been knowingly misused by an employer. 446 N.W.2d at 197–98. The *Hart* court further found that the manufacturer did not have a duty to warn of the alleged danger of its product because the danger resulted from the employer's misuse of the product, the danger "had been made known to everyone who worked with the" product, the manufacturer was unaware of the change in plans that created the danger, the manufacturer was unable to foresee the employer's misuse, the danger was the proximate cause

*Todalen,* 424 N.W.2d at 79 (where ultimate user, an employee, was unsophisticated, manufacturer could not justify its failure to warn by relying on employer's duty to warn, sophistication or knowledge of the product's dangers); *cf. In re Brooklyn Navy Yard Asbestos Litig.,* 971 F.2d 831, 838 (2d Cir.1992) ("The sophisticated intermediary doctrine protects a manufacturer from liability only if the chain of distribution is such that the duty to warn ultimate users should fall on an intermediary in that chain, rather than the manufacturer", for example, either a physician who prescribes a drug, or a bulk chemical manufacturer in situations where extensive warnings have been given, each party in distribution chain is a responsible intermediary and the ultimate user is "too remote").[13]

A federal district court in Nevada recently analyzed DuPont's liability under the bulk supplier's doctrine in another case involving a Vitek implant made from PTFE. *Forest v. E.I. DuPont de Nemours & Co.,* 791 F.Supp. 1460 (D.Nev.1992). In the absence of Nevada state law, the *Forest* court defined the doctrine as follows:

the relevant question in bulk supplier cases is whether the bulk supplier was objectively reasonable in relying on a knowledgeable intermediary to provide a warning to ultimate users. This involves proof of two elements: 1) that the bulk supplier was reasonable in believing that the intermediary knew of the dangers associated with the bulk product, and 2) that the bulk supplier was reasonable in relying on the intermediary to warn the ultimate user of such dangers.

*Id.* at 1466. The *Forest* court rejected DuPont's claim that under the bulk supplier doctrine, it had no duty to warn as a matter of law, concluding that:

for [d]efendant DuPont to succeed with its bulk supplier doctrine defense in the instant case, it will have to show that it reasonably relied upon Vitek's knowledge of the risks involved with using PTFE in medical implants and that it also reasonably relied upon Vitek to warn implant patients of those dangers. To do this, DuPont must show that it took some reasonable, affirmative steps to ascertain that Vitek was a knowledgeable intermediary. Such steps must rise

---

of the employee's death and the deceased employee had been aware of the danger. *Id.*

In *Audetat,* the court determined that a component parts manufacturer had no duty to warn because its product, a hydraulic ram, could be used in a wide variety of applications, and its purchaser, who used the ram to make a log splitter, "would know best the dangers associated with its particular use, and so it should determine the degree of safety provided." 1989 WL 131560, at *2. The court also determined, however, that the danger of the log splitter was obvious to any user, that the injured party was aware of that danger and that its use by two persons, the proximate cause of the accident at issue, was unforeseeable. *Id.*

In the present case, the danger associated with using PTFE was not an obvious one, Hegna contends she was unaware of any such danger, and presents evidence that DuPont knew of Vitek's intended use and also knew of the risk of using PTFE in such a manner. The court thus finds both *Hart* and *Audetat* distinguishable from the present case.

**13.** Other courts have interpreted the bulk supplier or sophisticated user doctrine in a similar manner. In *Sara Lee Corp. v. Homasote Co.,* 719 F.Supp. 417.(D.Md.1989), the court framed the issue of a bulk supplier's duty to warn under Maryland law as "whether ... the bulk suppli-

er[ ] could reasonably rely on the industrial purchaser to recognize the dangers associated with the product and to pass on warnings to end users." *Id.* at 424. The court is to focus "not on the knowledge of the raw material suppliers, but rather on the knowledge of the industrial purchaser." *Id.*

The Eighth Circuit applied Missouri law in *Donahue v. Phillips Petroleum Co.,* 866 F.2d 1008 (8th Cir.1989), and found that in order to avail itself of the defense:

[the] bulk supplier must [at least] provide adequate instructions to the distributor next in line or ascertain that the distributor is informed as to the nature of the product and is in a position to convey the information so that the ultimate consumer is apprised of the dangerous propensity of the product.

*Id.* at 1012.

In *Cimino v. Raymark Indus.,* 739 F.Supp. 328 (E.D.Tex.1990), a case involving Texas law, the court determined that "[t]he issue in every [bulk supplier] case is whether the original manufacturer has a reasonable assurance that its warning will reach those endangered by the use of its product." *Id.* at 331 (citing *Alm v. Aluminum Co.,* 717 S.W.2d 588, 591 (Tex.1986)).

The foregoing cases also reflect various considerations set forth in comment n to section 388 of the Restatement.

above the level of a mere disclaimer but need not go so far as to have required DuPont to second-guess Vitek's actions in carrying-out its own duty to warn. *Id.* at 1467 (footnote omitted).

The court finds that the reasoning set forth in *Forest* is persuasive and that if faced with the present situation, a Minnesota court would also hold that *Forest* defines an appropriate standard on which to determine whether DuPont discharged its duty to warn. *Cf. Ampro Corp.*, 361 N.W.2d at 143 (holding that both supplier of foam and manufacturer of foam mats had a duty to warn school about foam's unusual flammability).

■ DuPont further contends, however, that even if it had a duty to warn as a bulk supplier, it was relieved of that duty because the FDA approved the use of Proplast to make implants and regulated the sale of Proplast TMJ implants.[14] After FDA approval, DuPont argues that the sale of Vitek's implant was subject to extensive FDA regulatory controls, and that DuPont had a right to rely on the FDA to exercise such control to ensure that Vitek discharged its duty to provide a safe product with appropriate warnings. To support its right to rely on the FDA, DuPont first cites comment n to section 388, which states in part that:

> Modern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so.

*Restatement (Second) of Torts* § 388 cmt. n (1965). As previously discussed, however, comment n sets forth numerous factors to be considered when determining whether a party acted reasonably in relying on others to warn, and after examining those factors, the court determines that material fact disputes exist concerning whether DuPont's actions were reasonable. *See Goodbar,* 591 F.Supp. at 557 (discussing various factors set forth in comment n).

DuPont further relies on two state court opinions, *White v. Weiner,* 386 Pa.Super. 111, 562 A.2d 378 (1989), *aff'd,* 525 Pa. 572, 583 A.2d 789 (1991) and *George v. Parke-Davis,* 107 Wash.2d 584, 733 P.2d 507 (1987) (en banc), to support its contention. *White* held that when the finished product, a prescription drug, is regulated by the FDA, the bulk supplier of a pharmaceutical chemical had no additional duty to warn the drug manufacturer, or patients or their physicians, if the bulk supplier had complied with FDA regulations concerning its duty to label the bulk chemical. *White,* 562 A.2d at 385 ("beyond compliance with the labeling requirements of 21 U.S.C. § 353(a) and 21 C.F.R. § 201.122, [the bulk supplier] had no duty to provide a warning to [the drug manufacturer]"). The present case is distinguishable because it is unclear whether DuPont provided an adequate warning to Vitek.

The court also finds *George* distinguishable because it addressed the imposition of vertical liability on a bulk supplier in conjunction with its imposition of horizontal market share liability on all manufacturers of diethylstilbestrolon (DES). 733 P.2d at 515. The present case, however, involves no theory of market share liability because

---

**14.** The FDA, in a lengthy comment approving the use of PTFE to make medical implants, stated that it:

> agrees with the recommendation of both Panels and is proposing that polytetraflouroethylene [PTFE] with carbon fibers composite implant material be classified into class II (performance standards). Although the device is an implant, the agency believes that pre-market approval is not necessary because there is sufficient information available to establish a performance standard that would provide reasonable assurance of the safety and effectiveness of the device.

Wessel Aff. dated 4–10–92, Exh. F (FDA's published proposed rules, 47 Fed.Reg. 2819 (1982),

granting preliminary approval of the use of PTFE in medical implants).

On March 23, 1983, the FDA informed Vitek that it could market its Proplast implant under the general control provisions of the Federal Food, Drug and Cosmetic Act ("Act"), 21 U.S.C. § 301 et seq., until the implant was classified, after which the implant could be sold subject to additional controls.

On June 24, 1988, the FDA finalized its proposed rules, thereby approving both the use of PTFE to make Proplast and the use of Proplast to make TMJ implants. *See* 21 C.F.R. § 878.-3500.

it is undisputed that DuPont provided Vitek with the PTFE.

Moreover, other courts have held that FDA certification and regulation of a product, or a party's compliance with FDA or other governmental regulations, does not automatically relieve a party of either liability or its duty to warn. *See, e.g., Hill v. Searle Lab.*, 884 F.2d 1064, 1068 (8th Cir. 1989) ("FDA approval is not a shield to liability. FDA regulations are generally minimal standards of conduct...." (citations omitted)); *Stromsodt v. Parke–Davis & Co.*, 257 F.Supp. 991, 996 (D.N.D.1966) (although manufacturer had complied with all government regulations and requirements concerning drug, such standards were "minimal.... [D]efendant still owes a duty to warn of dangers of which it knew or should have known in the exercise of reasonable care."), *aff'd*, 411 F.2d 1390 (8th Cir.1969). Rather, FDA regulation and compliance merely constitutes evidence, although not conclusive, of the reasonableness of a party's actions. *See, e.g., Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652, 658 (1st Cir.1981) ("approval by the FDA of the language ... [contained in a warning] is not necessarily conclusive on the question of the adequacy of the warnings") (quoting *Chambers v. G.D. Searle & Co.*, 441 F.Supp. 377, 383 (D.Md.1975)); *Salmon v. Parke, Davis & Co.*, 520 F.2d 1359, 1362–64 (4th Cir.1975) (finding that compliance with federal laws and regulations does not in itself absolve a manufacturer of liability); *Toner v. Lederle Lab.*, 112 Idaho 328, 732 P.2d 297, 311 n. 12 (1987) ("Nothing in federal statutory or regulatory law indicates that FDA certification intends to preclude allegations of negligence.... FDA certification of a drug is evidence but not conclusive evidence of the drug manufacturer's reasonableness; the trier of fact may assign FDA approval the weight it deserves." (citations omitted)). These cases are consistent with section 288(c) of the Restatement, which provides that:

> Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a

reasonable man would take additional precautions.

*Restatement (Second) of Torts* § 288(c) (1965).

The Minnesota Supreme Court has similarly held that a warning's compliance with governmental regulations does not necessarily preclude a finding that a manufacturer or distributor negligently failed to warn. *Blasing v. P.R.L. Hardenbergh Co.*, 303 Minn. 41, 226 N.W.2d 110, 115 (1975) (manufacturer and distributor of solvent found negligent despite warning's compliance with federal and city regulations because such compliance does not demonstrate that they exercised due care as a matter of law). Based on the foregoing, the court concludes that FDA approval and regulation of the Proplast TMJ implant does not dispose of the issue of whether DuPont satisfied its duty to warn, but is rather one factor that the jury may consider when making that determination.

In summary, the court concludes that DuPont had a duty to warn at least Vitek of the dangers associated with the use of PTFE in jaw implants. Based on its determination that material fact disputes exist concerning the adequacy of DuPont's warning, the reasonableness of its reliance on Vitek to pass on any warnings, DuPont's knowledge of Vitek's intended use and Vitek's knowledge of any potential danger in using PTFE to make implants, the court concludes that DuPont's motion for summary judgment on Hegna's negligence claim should be denied. As a result of the fact disputes concerning the reasonableness of DuPont's reliance on Vitek to warn, at the present time the court declines to rule on the issue of whether DuPont had any duty to warn either Hegna or her physician.

### 2. *Hegna's Strict Liability Claim*

■ Hegna contends that DuPont is also strictly liable because PTFE was a defective product unreasonably dangerous for its intended use as a result of DuPont's

failure to warn.[15] Hegna bases her claim on section 402A of the Restatement, which provides that:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>> (a) the seller is engaged in the business of selling a product, and
>> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
> (2) The rule stated in Subsection (1) applies although
>> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

*Restatement (Second) of Torts* § 402A (1965).[16] DuPont contends, however, that Hegna's strict liability claim fails because PTFE was not defective when it left DuPont's hands and Vitek materially altered PTFE before making its implants. Comment p to section 402A declines to express any opinion concerning the propriety of applying principles of strict liability to a seller whose product is reprocessed or substantially changed before reaching the ultimate user:

> the Institute has refrained from taking any position as to the possible liability of the seller where the product is expected to, and does, undergo further processing or other substantial change after it leaves his hands and before it reaches those of the ultimate user or consumer.

It seems reasonably clear that the mere fact that the product is to undergo processing, or other substantial change, will not in all cases relieve the seller of [strict] liability.... The question is essentially one of whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes.

*Restatement (Second) of Torts* § 402A cmt. p (1965); *see also* caveat to § 402A. Based on its determination that material fact disputes exist concerning whether Vitek materially altered PTFE and whether DuPont was aware of either Vitek's intended use or the risks of using PTFE for such implants, the court determines that DuPont's motion for summary judgment on Hegna's strict liability claim should be denied.

The court notes, however, that in Minnesota:

> [t]he distinction between strict liability and negligence in ... failure to warn cases is that in strict liability, knowledge of the condition of the product and the risks involved in that condition will be imputed to the manufacturer, whereas in negligence these elements must be proven.

*Bilotta v. Kelley Co.*, 346 N.W.2d 616, 622 (Minn.1984). Based on the evidence suggesting that DuPont knew that PTFE might harm the recipients of implants made of PTFE, that Vitek was using its PTFE to manufacture implants and that Vitek believed that it did not need to issue warnings with its Proplast TMJ implant, the court declines to address at the present time whether to impute such knowledge to DuPont. *Cf. Omnetics, Inc. v. Radiant Technology Corp.*, 440 N.W.2d 177, 182

**15.** Hegna also asserts a strict liability claim independent of DuPont's failure to warn, specifically that "du Pont marketed a product unreasonable dangerous for the use intended". Hegna concedes, however, that this claim "also sounds in simple negligence". She further fails to provide any evidence to support either a defective design or manufacture claim. *See, e.g., Forest,* 791 F.Supp. at 1468 ("There are only three ways that a product may be defective ([and] 'unreasonably dangerous') under Re-statement (Second) of Torts § 402A: design defect, manufacturing defect, and defective due to failure to warn.") The court thus construed her strict liability claim as one involving only DuPont's alleged failure of to warn.

**16.** Minnesota adopted the theory of strict liability in *McCormack v. Hankscraft Co.,* 278 Minn. 322, 154 N.W.2d 488, 496 (1967) (adopting *Restatement (Second) of Torts* § 402A (1965)).

(Minn.Ct.App.1989) (finding no distinction between strict liability and negligence claims where manufacturer knew of potential dangers of product). If Hegna is unable to support her negligence claim at trial by presenting sufficient evidence of DuPont's knowledge, the court will then determine whether such knowledge should be imputed to DuPont.

### 3. *Hegna's Breach of Warranty and Misrepresentation Claims*

DuPont moves for summary judgment on Hegna's breach of warranty and misrepresentation claims. Hegna does not oppose Dupont's motion for summary judgment with respect to those claims, and thus the court will grant DuPont's motion for summary judgment on those claims.

Based on the foregoing, IT IS HEREBY ORDERED that:

1. DuPont's motion for summary judgment on Hegna's negligence claim is denied;

2. DuPont's motion for summary judgment on Hegna's strict liability claim for failure to warn is denied:

3. DuPont's motion for summary judgment on Hegna's breach of warranty claim is granted; and

4. DuPont's motion for summary judgment on Hegna's misrepresentation claim is granted.